**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TRI-DAM, | 1:11-cv-01141-AWI-MJS |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| RICHARD SCHEDIWY AND LAURA STRAUSS, | |
| Defendants. | (Docs. 64, 72) |
| _____/ | |

## I. INTRODUCTION

Plaintiff, Tri-Dam, and Defendants Richard Schediwy and Laura Strauss filed competing motions for summary pursuant to Federal Rule of Civil Procedure 56. Plaintiff filed its motion on October 18, 2013, the dispositive motions deadline. Defendants filed their opposition and motion on November 8, 2013, three weeks after the dispositive motions deadline. For the following reasons Plaintiff's motion for summary judgment shall be granted and Defendants' motion for summary judgment shall be denied.

///

## II. FACTS AND PROCEDURAL BACKGROUND

Tri-Dam, a joint venture between the South San Joaquin Irrigation District and Oakdale Irrigation District, owns and operates the Tulloch Hydroelectric Project No. 2067 located near the city of Copperopolis, California, pursuant to a license issued by the Federal Energy Regulatory Commission ("FERC"). First Amended Complaint ("FAC") at ¶¶ 3-4. The Tulloch Project boundary extends approximately 1,619 acres and includes all the land within the 515-foot elevation contour surrounding the Tulloch Reservoir. FAC at ¶ 5. FERC first granted Tri-Dam a license to operate the Tri-Dam Project on January 1, 1955, for a term ending December 31, 2004. FAC at ¶ 8. Article 39 of the license granted Tri-Dam the authority to grant permission for use of lands within the Tulloch Project boundary without prior approval of FERC. FAC at ¶ 8; Tulloch Reservoir Shoreline Management Plan, December 2002, ("SMP") at p. 1-1.

FERC requires that each licensee (Tri-Dam) obtain control of all lands needed for operation and maintenance of the project. Declaration of Dan Pope, Exhibit B ("FERC License") at p. 35, 114 FERC ¶ 62, 162 (2006). Sixty-one percent of the land within the FERC Project Boundary is privately owned, twenty-six percent of the land is owned by the Oakdale and South San Joaquin Irrigation Districts and twelve percent is owned by either the state or federal governments. SMP at p. 6. Tri-Dam obtained a flowage easement for all of the land within the FERC Project boundary in 1956. The easement to Oakdale and South San Joaquin Irrigation Districts, granted the following uses and purposes:

(a) The right to permanently overflow, flood and cover [the FERC Project Boundary] land with flood, slack, or back water created by the erection and operation of the Tulloch Dam across the Stanislaus River;
(b) The right to enter upon said land from time to time to clear, destroy, or dispose of any timber or other natural growth, any obstructions, accumulations, trash, filth and any other thing which would in any way interfere with the use of said reservoir, or the waters therein, or tend to render unsafe or unsanitary either the reservoir created by said dam or the margin thereof;
(c) The right to ingress to and egress from said lands for the purposes aforesaid.

Request for Judicial Notice ("RJN"), Exhibit A, Conveyance of Easement, Doc. 65-1 at p. 4; Separate Statement of Undisputed Material Fact ("SSF") at ¶ 7; SMP at p. 6. This easement applied to all property within the 515-foot elevation contour. *Id.*

2

In 2002, Tri-Dam developed Tulloch Reservoir's most current Shoreline Management Plan ("SMP")[1] in anticipation of obtaining a new license for the Tulloch Project.  Observing the FERC license required Tri-Dam to obtain FERC approval for (1) actions that would in any way reduce the storage capacity of Tulloch Reservoir and (2) use of lands within the FERC Project Boundary, the SMP recognized there was considerable public interest for development of the Tulloch Reservoir shoreline and that some of this development could conceivably have only minor impacts on reservoir storage or project operations.  Accordingly, the SMP expressed Tri-Dam's need to approach FERC for general approval of minor development activities to facilitate such activities within the Project Boundary and avoid the need to obtain FERC approval for every individual development activity.

The SMP described the minor development activities for which Tri-Dam had requested FERC's approval. One such minor development activity is the erection of a retaining wall. The SMP also outlined an "encroachment" permitting scheme through which parties could apply for – and Tri-Dam would issue – permits authorizing a particular use or facility within the FERC Project Boundary.  According to the SMP, all proposed development activities are subject to requirements of applying for and obtaining a Tri-Dam encroachment permit.

On December 23, 2002, Tri-Dam filed an application with FERC for a new license, pursuant to sections 4(e) and 15 of the Federal Power Act (FPA, 16 U.S.C §§ 791 et seq.), to continue operation and maintenance of the Tulloch Project; the SMP was included as an exhibit to the new license application.  On February 16, 2006, FERC issued a new license to Tri-Dam for a period of 39 years, 11 months subject to the terms and conditions of the FPA, which was incorporated into the license by reference.  (Between 2004 and 2006, Tri-Dam operated the Tulloch Project under an annual license pending the disposition of its new license application.) Article 411 of this license approves the SMP.  Article 413 gives Tri-Dam the authority to grant permission for certain uses and occupancies of project lands and waters, including non-commercial piers, landings and boat docks, without prior FERC approval, and continuing

---

[1] The SMP was submitted by Tri-Dam with its license application in 2002 and remained in effect until FERC approved the revised Reservoir Management Plan as directed by the 2006 FERC license. FAC ¶ 11. Thus, the SMP was in effect at all times relevant to this action.

3

responsibility to supervise and control the uses and occupancies for which it grants permission. If a permitted use or occupancy violates any condition imposed by the license or by Tri-Dam, article 413 further gives Tri-Dam authority to take any lawful action necessary to correct the violation, including canceling the permission to use and occupy the project lands and waters and requiring the removal of any non-complying structures and facilities.

Defendants Richard Schediwy and Laura Strauss own real property in Copper Cove Estates, located at 4378 Council Trail, Copperopolis, in Calaveras County, California ("Subject Property"). Joint Statement of Undisputed Facts ("JSF") at ¶ 1. Defendants applied with Tri-Dam for a permit to build a "concrete block stemwall / slopped back retaining wall at the 515' contour elevation" in the Tulloch Reservoir. JSF at ¶ 2. On February 28, 2004, Tri-Dam granted Defendants' application. JSF at ¶ 2; Declaration of Richard Schediwy, Doc. 72-3, ("Schediwy Dec.") at ¶ 2. Defendants' contractor installed the entire retaining wall on the Subject Property below the 515-foot elevation contour. JSF at ¶ 3. Although there is some disagreement about the exact contour elevation of the retaining wall, it is agreed the wall was constructed between the 504 and 506-foot contour lines. Schediwy Dec. at ¶ 2; Schediwy Dec., Exhibit A.

On May 6, 2004, Susan Larson, Tulloch Coordinator, wrote Defendants on behalf of Tri-Dam to demand the removal of the wall constructed in violation of the permit requirements and the submission of a compliance proposal by Defendants by May 14, 2004. Doc.72-3, Exhibit A. Defendants made contact with Kathleen Norton, U.S. Army Corps Engineer, for direction regarding the removal of the retaining wall and informed Ms. Larson of their contact. Schediwy Dec. at ¶ 4. Defendants did not submit a compliance proposal as required by Tri-Dam. Schediwy Dec. at ¶¶ 4-5. On July 13, 2004, Ms. Larson wrote a letter to Defendants informing them their use of the retaining wall as a boat dock was in violation of permit conditions and again urging Defendants to submit a proposal that would bring their property into compliance. Schediwy Dec., Exhibit C. On July 22, 2004, Defendants informed Ms. Larson that they received instruction from Ms. Norton to wait until winter when the water level drops below the five-hundred foot mark, remove the existing wall, gently back-fill to restore the original contour, and embark on new excavation to accommodate the new retaining wall. Doc. 72-3, Exhibit J. On September 16,

2004, Ms. Larson provided Defendants with a copy of the 2002 SMP detailing the application process for approval of a retaining wall. Schediwy Dec. at ¶ 11.

Defendants were unable to engage the services of the contractor who they had hired to build the wall. Defendants unsuccessfully attempted to retain six other contractors who could or would not accept the job. Schediwy Dec. at ¶ 22. Defendants were unable to secure permission from their neighbors to haul the debris, which would be generated by destruction of the wall, across their properties. Schediwy Dec. at ¶ 21. Defendants did not submit to Tri-Dam an application for a permit to build a new wall nor did they remove the improperly placed wall.

On December 31, 2004 Tri-Dam's license to operate the Tulloch Project expired. Tri-Dam for two years thereafter operated under an annual license until a new license was granted on February 16, 2006. FERC License at p. 2.

In June 2005, Mr. Schediwy initiated arbitration against his former contractor for breach of contract due to the building of the wall that was not in compliance with the Tri-Dam permit. On December 12, 2005, Arbitrator Daniel Yamshon issued an award of $43,036.55 to compensate Mr. Schediwy for: the payments made to the contractor for the building of the wall, expenses incurred by Mr. Schediwy based on the negligent building of the wall, the cost of demolition and debris removal. Declaration of Thomas Marrs, ("Marrs Dec.") Exhibit F. On March 7, 2006, the arbitration order was confirmed by the Honorable Calavaras County Superior Court Judge William Kelsay. Marrs Dec., Exhibit F.

On July 8, 2011, Plaintiff filed suit in this court seeking an order permanently enjoining Defendants from maintaining a retaining wall that they had unlawfully constructed on the Subject Property at the 504-foot to 505-foot contour elevation. The retaining wall is still in place.

### III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "informing the district court of the basis for its motion, and

1  identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

2  admissions on file, together with the affidavits, if any,' which it believes demonstrate the

3  absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986);

4  *see* Fed. R. Civ. P. 56(c)(1)(A).  "Where the non-moving party bears the burden of proof at trial,

5  the moving party need only prove that there is an absence of evidence to support the non-moving

6  party's case." *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (9th Cir. 2010) (citing

7  *Celotex, supra,* 477 U.S. at p. 325).  If the moving party meets its initial burden, the burden shifts

8  to the non-moving party to present evidence establishing the existence of a genuine dispute as to

9  any material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574,

10  585-86 (1986). To overcome summary judgment, the opposing party must demonstrate a factual

11  dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see*

12  *Anderson,* 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626,

13  630 (9th Cir.1987), and genuine, i.e., the evidence is such that a reasonable jury could return a

14  verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th

15  Cir.1987). In order to demonstrate a genuine issue, the opposing party "must do more than

16  simply show that there is some metaphysical doubt as to the material facts.... Where the record

17  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

18  'genuine issue for trial." *Matsushita, supra,* 475 U.S. at p. 587 (citation omitted).

19      A court ruling on a motion for summary judgment must construe all facts and inferences

20  in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,* 477

21  U.S. 242, 255 (1986). Nevertheless, inferences are not drawn out of the air, and it is the opposing

22  party's obligation to produce a factual predicate from which the inference may be drawn. *See*

23  *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d

24  898, 902 (9th Cir.1987).

25                             **IV. DISCUSSION**

26      Plaintiff presents three arguments that it asserts entitle it to the requested injunctive relief:

27  First, Defendants' recovery of damages against their contractor based on their claim that they

28  were required to remove the retaining wall requires judicial estoppel of Defendants' position that

1  the wall need not be removed. Second, FERC has granted Tri-Dam the authority to approve or

2  deny all minor encroachments on the Tulloch Reservoir and requires Tri-Dam to seek removal of

3  all unpermitted or non-compliant developments. Third, Tri-Dam's broad easement over the

4  Subject Property allows it to remove anything which in any way interferes with the use of the

5  Tulloch Reservoir.

6  **A. Judicial Estoppel**

7       Plaintiff asserts that "Defendants are judicially estopped from opposing Tri-Dam's

8  request that they remove their unauthorized retaining wall because Schediwy benefitted from

9  taking the opposite position in an earlier judicial proceeding." Plaintiffs Motion for Summary

10  Judgment ("PMSJ") at p. 10. The doctrine of judicial estoppel, sometimes called the doctrine of

11  preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one

12  position, and then seeking a second advantage by taking an incompatible position. *Blix St.*

13  *Records, Inc. v. Cassidy,* 191 Cal.App.4th 39, 47 (2010). The application of judicial estoppel is

14  not limited to bar the assertion of inconsistent positions in the same litigation, but is also

15  appropriate to bar litigants from making incompatible statements in two different cases. *Rissetto*

16  *v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 605 (9th Cir. 1996) ("We now make it

17  explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the

18  same litigation"); *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.,* 910 F.2d

19  1540, 1548 (7th Cir.1990) (estoppel is even more appropriate where the incompatible statements

20  are made in two different cases, since "[i]nconsistent positions in different suits are much harder

21  to justify" than inconsistent pleadings within one suit).

22       The doctrine's dual goals are to maintain the integrity of the judicial system and to protect

23  parties from opponents' unfair strategies. *See Aguilar v. Lerner,* 32 Cal.4th 974, 986 (2004); *New*

24  *Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Judicial estoppel is an equitable doctrine

25  invoked by courts in their discretion. *Id.*; *see also Yanez v. United States,* 989 F.2d 323, 326 (9th

26  Cir.1993). Because of its harsh consequences, the doctrine should be applied with caution and

27  limited to egregious circumstances. *Gottlieb v. Kest,* 141 Cal.App.4th 110, 132 (2006); *MW*

28

*Erectors, Inc. v. Niederhauser Ornametal and Metal Words Co., Inc*., 36 Cal.4th 412, 422 (2005).

The doctrine should apply when: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. *Jackson v. County of Los Angeles,* 60 Cal.App.4th 171, 183 (1997); *Miller v. Bank of America N.A.,* 213 Cal.App.4th 1, 9 (2013) (citations omitted).

*1. The Same Party Has Taken Two Positions.*

In the arbitration proceeding between Mr. Schediwy and his former contractor it was determined, based on Mr. Schediwy's testimony and the testimony of Susan Larson, that the retaining wall "needs to be demolished and removed." Marrs Dec., Exhibit F at p. 10. From the face of the arbitration award it is unclear whether or not Mr. Schediwy explicitly indicated that the wall would have to be removed but he certainly benefited from that finding as it appears to have been the primary contributing factor in Mr. Schediwy's recovery. *Id.* In fact, Mr. Schediwy was awarded $28,125.00 to compensate him for the necessary demolition and debris removal. *Id.* at p. 11.

In the case presently before this Court Defendants deny that they have ever refused to remove the retaining wall. Amended Answer ("AA") at ¶ 13. However, Defendants oppose the complete removal of the retaining wall, including the footings. *Id.* Defendants instead support what they have called an "alternative mitigation plan," which proposes using the footings that are presently used to support the retaining wall to eventually support a dock once the present retaining wall is demolished and a new wall is built in conformity with the terms of the SMP and any permit issued by Tri-Dam.

Defendants first advanced the position that the wall was required to be removed. Defendants now oppose the complete removal of the wall. Although Defendants attempt to minimize the difference between these positions, they are, in fact, two different positions.

*2. The Positions Were Taken In Judicial or Quasi-Judicial Proceedings*

8

The Ninth Circuit has held that prior statements made in administrative hearings or in arbitration proceedings are appropriate subjects of judicial estoppel. *Rissetto* 94 F.3d at p. 604; *PowerAgent Inc. v. Electronic Data Systems Corp*, 358 F.3d 1187, 1192-1193 (9th Cir. 2004); *Admiral Insurance Co. v. Rushmore,* 70 F.3d 1277, 1995 WL 693335 (9th Cir. 1995) (unpublished); *see also, In re Siller,* 427 B.R. 872, 886 (E.D. Cal. 2010); *Speroni S.p.A. v. Perceptron Inc.,* 12 Fed. Appx. 355, 358 (6th Cir. 2001) (unpublished). The rationale for application of judicial estoppel to these situations is that the "truth is no less important to [an entity] acting in a quasi-judicial capacity than it is to a court of law." *Rissetto,* 358 F.3d at p. 604. The same rationale applies here.

The arbitration proceeding in question had many of the formal hallmarks of a judicial proceeding such as: the ability to call witnesses, the swearing of an oath of truthfulness by the parties, and a neutral party presiding over the hearing. Marrs Dec., Exhibit F at p. 4.[2]

The action before this Court is clearly a judicial proceeding.[3]

Accordingly, neither the arbitration proceeding nor the action before this court fall outside the appropriate scope of judicial estoppel.

### *3. The Party Was Successful In Asserting The First Position*

A party is successful in asserting a position for purposes of judicial estoppel when a position is successful in persuading a fact finder to accept the party's position. *New Hampshire v. Maine*, 532 U.S. at p. 750. "Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations' [citation] and thus poses little threat to judicial integrity." *Id.* at p. 751 (citations omitted).

The arbitrator in the action between Mr. Schediwy and his former contractor awarded Mr. Schediwy $28,125.00 for removal of the uncompleted sea wall based on his claim for the same.

---

[2] The statements made by Mr. Schediwy's counsel to his former contractor in the letter attached as Exhibit R to Mr. Marrs' Declaration were not statements taken in judicial proceedings and are accordingly not considered for purposes of judicial estoppel analysis (except to the extent that they are concurrent with what was presented in the arbitration hearing).

[3] This Court does not find merit to Defendants contention that the statements made in their amended answer are not valid evidence. *See Am. Title Ins. Co. v. Lovelace Corp.,* 861 F.2d 224, 226 (9th Cir. 1988); Tamsco Properties, LLC v. Langemeier, 2013 WL 246782 at *1 (E.D. Cal. 2013) (slip copy) ("Factual assertions in pleadings, unless amended, are considered judicial admissions conclusively binding on the party who made them.")

1  Marrs Dec., Exhibit F. at pp. 4, 10-11. Accordingly, Mr. Schediwy was successful in asserting

2  his first position.

3  *4. The Two Positions Are Not Totally Inconsistent*

4       The Ninth Circuit has adopted a liberal approach in interpreting this element of judicial

5  estoppel, reflecting its preference that claims be litigated on their merits. *See Admiral Ins. Co. v.*

6  *Rushmore*, 70 F.3d 1227, 1995 WL 693335 at *3 (9th Cir. 1995) (unpublished) (Noting that "in

7  most cases, [the Ninth Circuit] has declined to preclude the litigants' allegedly inconsistent

8  claims.). The Supreme Court has indicated that this element is significant when "judicial

9  acceptance of an inconsistent position in a later proceeding would create the perception that

10  either the first or second court was misled." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170

11  (2010).

12       Although this Court does not have a transcript of the arbitration hearing, from the limited

13  record it appears that Mr. Schediwy sought to recover the cost of removing the improperly

14  placed uncompleted retaining wall based on representations from Tri-Dam that the wall would

15  have to be removed. Marrs Dec., Exhibit F at p. 4. It appears that in the arbitration hearing that

16  the arbitrator and Mr. Schediwy relied upon Ms. Larson's testimony that the wall would have to

17  be removed. In the case before this Court, Defendants admit that the retaining wall was

18  improperly placed and that it should be removed from its present location. Defendants dispute

19  Tri-Dam's demand that they remove the footings that presently support their retaining wall and

20  backfill the area to its pre-excavation condition only to excavate again to build a retaining wall in

21  compliance with a Tri-Dam permit. The arbitration award is consistent with this stance as it

22  provides damages for "demolition and debris removal" not for filling of the land to return it to its

23  pre-excavation state. Accordingly, this Court does not believe the positions taken by Defendants

24  to be totally inconsistent.

25  *5. The First Position Was Not Taken As A Result Of Ignorance, Fraud, or Mistake*

26       Although Defendants' position was taken in reliance on Tri-Dam's insistence that the

27  retaining wall be removed, it cannot be said to have been a result of ignorance, fraud, or mistake

28  that Defendants advanced that position at the arbitration hearing.

*6. Conclusion*

The doctrine of judicial estoppel is invoked by courts in their discretion. The position that judicial estoppel should be reserved for the most egregious attempts at attaining unfair advantage and misleading the court is in line with the Ninth Circuit's preference for adjudication on the merits. Here, Defendants asserted two distinct but not totally incompatible positions. As a result, this Court, in its discretion, will not judicially estop Defendants from arguing that the footings of their retaining wall should be permitted to remain intact if they seek and obtain from Tri-Dam a permit to build a retaining wall and dock that could make use of the footings as presently located.

**B. FERC's Enforcement Authority Delegated to Tri-Dam**

Plaintiff argues that by granting the Tri-Dam license and approving the SMP, "FERC has exercised its plenary regulatory authority to prohibit any and all developments with the project boundary … not approved by Tri-Dam." MSJ at p. 15. Plaintiff asserts that FERC regulatory authority over the project boundary alone grants Tri-Dam the right to enforce the terms of the SMP against private property owners within the project boundary.[4] Plaintiff mistakes its duty to comply with and enforce the FERC license with a grant of the property rights necessary to enforce the license against property owners within the project boundary.

Under the Federal Power Act, FERC has the power to issue licenses to private parties to construct and operate dams and similar projects. *See* 16 U.S.C.A. § 797(e) (West 2000 & West Supp.2009). Furthermore, FERC may delegate its responsibility to ensure that the uses of the project lands are consistent with the public interest to the licensees. *See Union Electric Co., d/b/a*

---

[4] Plaintiff cites *DiLaura v. Power Authority of N.Y.*, 786 F.Supp. 241 (W.D. N.Y. 1991) in support of its position that FERC has full regulatory authority, however, the *DiLaura* Court refers to FERC's power to enforce conditions of the FPA against a licensee in operation of the project.

The 8th Circuit's opinion in *Coalition for Fair and Equitable Regulation of Docks on Ozarks v. FERC*, 297 F.3d 771 (8th Cir. 2002), specified that FERC requires licensees to develop project resources and permits them to recruit public and private interests to help do so; FERC does not grant licensees the necessary property rights to regulate private property within the project boundary.

In *VA Timberline, LLC v. Appalachian Power Co.*, 2008 WL 269544 at *2-4 (W.D. Va. 2008) the court recognized the licensee's right to grant permits based on the facts that (1) Timberline sought to build its dock within the project boundary and (2) the licensee had obtained property rights by way of an easement over the area that specifically provided for "remov[al] of … any and all structures, improvements … and objects" in the project area. The court explained that licensee's ability to remove the dock rested on their easement over the property. *Id* at. *4-5.

*AmerenUE,* 90 FERC ¶ 61,249, at *61833 (2000). Here, FERC delegated the regulation of the project lands at issue to Tri-Dam in 1956 and further delegated its responsibilities to Tri-Dam when FERC adopted the SMP. This Court has previously held that "Articles 411 and 413 of Tri-Dam's FERC license essentially permit Tri-Dam to regulate certain uses and occupancies of land in the FERC Project Boundary without prior FERC approval, in accordance with the SMP. However, the license merely gives Tri-Dam authority to do so; it does not give Tri-Dam the right to do so."  Tri-Dam v. Yick, 2013 WL 752197 at *4 (E.D. Cal. 2013) (unpublished). To clarify this Court's holding, Articles 411 and 413 of the FERC license authorize Tri-Dam to issue permits for minor encroachments (i.e. Tri-Dam's issuance of permits to private landowners does not violate Tri-Dam's licensure agreement). Article 413 also imposes upon Tri-Dam a duty to ensure that lands within the project boundary are not put to a use that violates the FERC license.[5] Articles 411 and 413 do not grant Tri-Dam a property right over lands within the project boundary.

The inclusion of lands within a project boundary serves the function of indicating that the lands are used in some manner for project purposes. However, the mere inclusion of lands within a project boundary will not restrict landowner uses, since such inclusion does not itself create or alter property rights. *See*, *e.g.*, *PacifiCorp*, *order on rehearing*, 80 FERC ¶ 61,334, at 62,113 (1997). A licensee is required to acquire and retain all interests in non-federal lands necessary or appropriate to carry out project purposes. *See id.*; Article 5 of FERC License; *VA Timberline, L.L.C. v. Appalachian Power Co.,* 343 F. App'x 915, 917 (4th Cir. 2009) (unpublished); 18 C.F.R. § 4.32. "These interests can be obtained through easement, fee title, leases, and other types of conveyances. The instruments of conveyance define the extent of the licensee's right." *Union Elec. Co.*, 137 FERC ¶ 61114 at *8 (2011). Further supporting the conclusion that a FERC license conveys no interest in property, Title 16 of the United States Code Section 814 provides that a licensee may, in the appropriate situation, exercise the right of eminent domain to secure a right to property necessary to operation of a dam, reservoir or the works appurtenant or

---

[5] 16 U.S.C. § 825p creates jurisdiction in the federal courts to enforce FERC licenses against a FERC licensee. *U.S. v. Southern California Edison Co.*, 300 F.Supp.2d 964, 985 (E.D. Cal 2004).

1  accessory thereto. 16 U.S.C. § 814. There would be no need for the use of eminent domain if the

2  FERC license granted the necessary property interest to a licensee to operate the project.

3      "[A] SMP is only applicable to lands owned or controlled by a licensee, and has no effect

4  on shoreline areas in which a licensee has no interest." *Union Electric Co.,* 137 FERC ¶ 61114 at

5  *4. "[A]n entity with unencumbered fee title to lands within the project boundary is free to use

6  them as that entity sees fit." *Union Elec. Co.*, 140 FERC ¶ 61210 (2012); *see also Metro*

7  *Hydroelectric Co., LLC v. Metro Parks,* 541 F.3d 605, 612-613 (6th Cir 2008) (holding that

8  FERC does not convey a property interest to enter land to conduct an activity required by FERC

9  to obtain or maintain a FERC license or permit.)

10     Therefore, Tri-Dam's right to enforce the SMP is restricted by the scope of Tri-Dam's

11  property interest, in this case an easement, in the Subject Property.

12  **C. Tri-Dam Easement**

13     In 1956, the Oakdale Irrigation District and South San Joaquin Irrigation District

14  obtained an easement that extends, at its upper bound, to the 515-foot contour elevation of the

15  Tulloch Reservoir. RJN, Exhibit A, Doc. 65-1. Defendants were on record notice of the easement

16  as evidenced by the title report submitted by Plaintiff[6] and Defendants' Guarantee of Title. Marrs

17  Dec., Exhibit S; Schediwy Dec., Exhibit Z. It is undisputed for purposes of this motion that the

18  retaining wall was built below both the 515-foot contour line (where the easement begins) and

19  the 510-foot contour line (the high water line and height at which the Schediwy permit required

20  the retaining wall built). JSF at ¶ 3; Schediwy Dec. at ¶ 2; Schediwy Dec., Exhibit A; Pope Dec.

21  at ¶10.

22     The extent of an easement "is determined by the terms of the grant, or the nature of the

23  enjoyment by which it was acquired." Cal. Civ. Code, §806. With an express easement, as in this

24  case, the only interests that are transferred from the grantor to the grantee are the interests

25  expressed in the grant and those necessarily incident to the interests. *Pasadena v. California-*

---

26

27  [6] Defendants complain that the Title Report is dated March 19, 2013, after the close of discovery. Defendants
    contend that the report is therefore unauthenticated and inadmissible. There is "evidence sufficient to support a

28  finding that the item is what the proponent claim it is." Fed. R. Evid. 901. Additionally, Defendants' Guarantee of
    Title is evidence of recordation of the easement attached to Defendants' property.

1    *Michigan Land & Water Co*., 17 Cal.2d 576, 579 (1941). An easement, "unless it is ambiguous,

2    must be construed by a consideration of its own terms. The meaning and intent thereof is a

3    question of law …." *Gray v. McCormick*, 167 Cal. App. 4th 1019, 1024 (2008) (citation

4    omitted). The owner of the servient estate may make "use of the area the easement covers so

5    long as the use does not 'interfere unreasonably' with the easement's purpose." *Scruby v. Vintage*

6    *Grapevine, Inc.,* 37 Cal.App.4th 697, 702-703 (1995) (citing *Camp Meeker Water System, Inc. v.*

7    *Public Utilities Com.* (1990) 51 Cal.3d 845, 867). Certain uses of lands that are restricted by

8    easements are deemed to be an unreasonable interference with the land, as a matter of law. See,

9    e.g., *Pacific Gas & Electric Co. v. Hacienda Mobile Home Park*, 45 Cal. App. 3d 519, 528 (1st

10   Dist. 1975). Owner of a servient tenement "may not use their property in a way that obstructs the

11   normal use of the easement." *Spencer & Morin Properties, Inc. v. Johnson*, ___Cal.Supp.___,

12   2012 WL 6686093 at *2 (2012) (unpublished) (citing *Blackmore v. Pawell,* 150 Cal.App.4th

13   1593, 1599 (2007).

14       The easement language, as stated above, grants Plaintiff "[t]he right to overflow the …

15   land, … enter upon said land … to clear, destroy, or dispose … any *obstructions* … and *any*

16   *other thing* which would *in any way* interfere with the use of said reservoir, or the waters therein,

17   or tend to render unsafe or unsanitary either the reservoir created by said dam or the margin

18   thereof." RJN, Exhibit A, Doc. 65-1; SSF at ¶ 7 (emphasis added). This language is onerous but

19   unambiguous. Tri-Dam has the right to destroy, clear or dispose of anything that in any way

20   interferes with Tri-Dam's use of the reservoir or with the waters.

21       In *VA Timberline, LLC v. Appalachian Power Co.*, the licensee operating the

22   hydroelectric development obtained an easement that permitted it to "cut, burn, and/or remove

23   … any and all buildings, structures, improvements … and other objects … located on the

24   premises below the countor the elevation of which is 620 feet." The licensee quitclaimed all

25   interest in its easement permitting it to remove structures within the project boundary to a

26   developer "subject to the terms and conditions of its FERC license." *VA Timberline, LLC v.*

27   *Appalachian Power Co.* (*"Timberline"*), 2008 WL 269544 at *4, *aff'd* 343 Fed.Appx. 915 (4th

28   Cir. 2009). The developer then sought to construct a dock that would violate the terms of the

SMP. The licensee denied the developer permission to construct the dock. Fourth Circuit affirmed the District Court's holding that, based on the property rights maintained under the easement, rather than the terms of the SMP, the licensee could remove the dock in question. *Id* at *4-5 and p. 918. The easement in the case at bar predates the SMP and is not contemporaneous with its terms. Accordingly, it is possible here that a violation of the SMP may not necessarily violate Tri-Dam's easement. In order to be subject to removal the retaining wall must violate Tri-Dam's easement.

  As discussed, the easement provides that Tri-Dam may remove anything which would in any way interfere with the use of the reservoir or the waters therein, or that tends to render unsafe or unsanitary the reservoir or the margin thereof. Accordingly, in order for Tri-Dam to prove a violation of its easement it must adduce some evidence that the encroachment complained of actually interferes with one of the aforementioned items. Article 413 of the FERC license requires as a condition of licensure that Tri-Dam comply with the SMP. FERC License at p. 28. Tri-Dam claims that any violation of the SMP would interfere with Tri-Dam's continued use of the reservoir since it could result in revocation of its FERC license.

  Section 4.4(2) of the SMP states that "[t]he construction of any facility must be completed as described in the approved permit and within twelve months from the date of permit approval by Tri-Dam . . ." SMP at p. 10. Defendants do not dispute that the construction of their wall was not as described in the approved permit and within twelve months of the date of approval. JSF at ¶ 3. Defendants therefore are in violation of the SMP. [7] Despite the fact that the parties agree that there is evidence of violation of the SMP, Tri-Dam has failed to establish that the violation of the SMP would in fact violate the easement. Tri-Dam has submitted no evidence to suggest that FERC would revoke its license based on potential encroachments that do not

---

[7] A violation of the SMP has been established. Accordingly, the Court does not need to revisit Plaintiff's prior contention that SMP Section 6.3(1) was violated merely by constructing a facility below the 510-foot contour line. *See* Doc 32 at pp. 14-15. Mr. Pope's declaration in support of Plaintiff's motion for summary judgment at ¶ 10 (stating that some structures are built below the 510-foot contour line) and the Court's reading of Section 6.3 (as requiring that a facility must not extent more than 40 feet from the shoreline) confirm this Court's prior conclusion that the SMP is not violated merely because the structure was built below the 510-foot contour line. Doc. 32 at p. 15.

interfere with the actual operation of the project. The argument that any violation of the SMP is a violation of the easement is therefore rejected.

Tri-Dam has submitted undisputed evidence that indicates that the retaining wall was built at or below the 506-foot contour line. Accordingly, the wall intrudes several feet below 510-foot contour level; the normal high water level of the Tulloch Reservoir. In doing so, the Schediwy structure, in some way, interferes with the waters within the reservoir by displacing the normal flow of the waters.

Since the retaining wall is an obstruction or thing that in some way interferes with the waters of the reservoir by existing below the high water mark and displacing the waters it may be destroyed or disposed of as permitted the Tri-Dam easement.

**D. Defendants' Motion For Summary Judgment**

*1. Timeliness*

Defendants' counsel, Ms. Clack, has missed deadlines three times before. After the denial of Defendants' motion to dismiss the First Amended Complaint on December 11, 2012, Defendant was required to file an answer within fourteen (14) days. Defendant failed to do so.

On March 30, 2012, Ms. Clack missed the deadline for initial disclosures. Ms. Clack eventually filed late initial disclosures.

On April 30, 2013, Judge Snyder issued an order denying Plaintiff's request for sanctions based on Ms. Clack having missed an expert disclosure deadline. The Court again made clear to Defendants that no further delays would be tolerated. The Court reintegrated "Deadlines are serious. There must be no more delayed responses or missed deadlines in this case." Despite this admonition Defendants again missed a deadline.

The parties proposed on May 14, 2013, a scheduling order with a dispositive motion deadline of October 18, 2013. Judge Snyder adopted the proposed scheduling order in whole. Defendants moved for Summary Judgment on November 8, 2013. Defendants were three weeks late in filing their motion.

Rule 16 of the Federal Rules of Civil Procedure Section (f)(1)(C) provides that the Court may issue any just order, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its

attorney fails to obey a scheduling or other pretrial order. Fed. R. Civ. P. 16(f)(1)(C). Rule

37(b)(2)(A)(iii), (vi), and (vii) provide that the court may issue an order striking pleadings in

whole or in part, rendering default judgment against the disobedient party, or treating as

contempt of the court the failure to obey any order. Fed. R. Civ. P. 37(b)(2)(A)(iii),(vi)-(vii).

*2. Effect of Granting Plaintiff's Motion for Summary Judgment*

This Court has made the determination to grant summary judgment in favor of Plaintiff

due to the violation of express terms of the easement. Since Defendants' motion is based in part

on an argument that the easement was not violated it cannot be granted.

Based on Defendants' prior and present unexcused and unjustified violations of deadlines

and scheduling orders and based on the inconsistency of their argument with the with the Court's

findings in the preceding portion of this order, this Court strikes Defendants motion for summary

judgment.[8]

**E. Permanent Injunction**

A claim for permanent injunction requires a plaintiff to show "(1) that it has suffered an

irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction." *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836, 843

(9th Cir. 2007) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

*1. Irreparable Injury*

Loss of an interest in real property constitutes an irreparable injury. *Park Village Apt.*

*Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011); Sundance Land

Corp. v. Community First Fed'd Sav. & Lan Ass'n, 840 F.2d 653, 661 (9th Cir. 1988). Here, a

failure to enjoin Defendant's nonconforming use of the servient tenement would deprive Plaintiff

of its property rights under its easement.

---

[8] Defendants' argument regarding the proposed injunction, specifically the potential harm to the lake bed, is considered and addressed in the following section.

1    Substantial harm to or loss of business constitutes an irreparable injury. *Doran v. Salem*

2    *Inn, Inc.*, 422 U.S. 922, 932 (1975). As this Court held on the same facts in *Tri-Dam v.*

3    *Schediwy*, 2011 WL 6692587 at *10 (E.D. Cal. 2011) (unpublished), and discussed above, Tri-

4    Dam has adduced evidence showing irreparable injury in the form of a violation of Section

5    4.4(2) of the SMP in addition to the permit violation. As discussed above, Tri-Dam's failure or

6    inability to correct SMP violations places its license to operate the dam in jeopardy.[9]

7    *2. No Remedy at Law*

8    Monetary damages would not suffice to remedy Defendants' violation of the SMP or the

9    interference with the waters of the Tulloch Reservoir. Accordingly, Plaintiff has no remedy at

10   law.

11   *3. Balance of Hardships*

12   Plaintiff has a strong interest in obtaining an injunction ensuring compliance with its

13   FERC license. If Plaintiff fails to gain compliance its FERC license could be subject to

14   forfeiture. Defendants do not dispute that their wall was constructed in violation of the permit

15   and below the 510-foot contour elevation. Rather, Defendants allege that "Section 4.6 [of the

16   SMP] provides for 'modification' as an option to Tri-Dam for non-complying structures."

17   Opposition to Motion for Summary Judgment ("Opposition") at p. 26. Defendants omit from

18   their motion the fact that the SMP provides that any one or more of the following could be

19   imposed as consequences for failure to comply with SMP regulations: "unwanted construction

20   delays, suspension or cancellation of approved applications, increase in fees, modification or

21   removal of non-complying structures and restoration of disturbed areas at the owner's expense,

22   loss of any consideration for future reservoir use applications until the violation is successfully

23   resolved." SMP at p. 11. Although Defendants claim that they did not actually obtain a copy of

24   the SMP until they sought to submit a new permit application, it was accessible to them at any

25   time. Accordingly, Defendants' argument that they were without constructive knowledge is

26   unavailing.

27

28   [9] This Court does not need to determine whether the wall threatens public safety and impedes navigation for purposes of establishing an irreparable injury.

As Plaintiff notes, if this Court refuses to grant injunctive relief Plaintiff will have no ability to enforce the SMP or uniformly regulate development on the Tulloch Reservoir. MSJ at p. 26. Such a position would render Plaintiff unable to prevent obstructions that could decrease the holding capacity of the reservoir and impair its ability to provide electricity, water, and recreation to the area, as required by its license and the SMP.

Defendants do not seek to oppose destruction of their wall. Instead they seek to use the footings of the existing structure as supports for a new dock; a measure that they claim will prevent shoreline erosion. Although Defendants have no legal claim of entitlement to a modification of their permit prior to their destruction of the improperly built retaining wall, this Court recognizes Defendants' concerns of inefficiency at removal of the retaining wall and filling of the shoreline only to excavate the recently filled land pursuant to a new permit. Further, the court recognizes that any unnecessary excavation in the lake bed that would cause damage to the reservoir is a harm that both parties would seek to avoid.

To the extent possible, if the project could be accomplished as Defendants suggest and comply with Plaintiff's permit procedure this Court believes that equity would be served by such a resolution.

Generally, when a court makes a determination upon balancing the equities it considers the cost of compliance for a defendant. Here, the monetary cost of compliance for Defendants, although relatively high, was awarded to Defendants in 2005.

Based on the foregoing, this Court concludes that the balance of hardships favors the Plaintiff.

### *4. Public Interest Not Disserved*

The public has an interest in navigability and safety of the reservoir. In order for Plaintiff to ensure that the reservoir is maintained in conformity with SMP requirements it must be able to ensure that any interference with the waters of the Tulloch Reservoir be prevented. The public would not be disserved by enforcement of the Tri-Dam easement.

Further, the public has an interest in continued operation of the Tulloch Project. Tri-Dam could be hindered in that operational goal if no injunction were granted.

1    Accordingly, public policy would not be disserved by granting of this injunction.

2  *5. Scope of Injunction*

3    "The essence of equity jurisdiction has been the power of the [court] to do equity and to

4  mold each decree to the necessities of the particular case. Flexibility rather than rigidity has

5  distinguished it." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citing *Hecht Co. v.*

6  *Bowles*, 321 U.S. 321, 329 (1944)). District Courts are granted wide latitude in shaping equitable

7  relief. *Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1136 (9th Cir. 2009); *Apple Inc. v.*

8  *Psystar Corp.*, 673 F.Supp.2d 943, 951 (N.D. Cal. 2009).

9    Here, Plaintiff has a procedure for the public to obtain encroachment permits for

10 properties that fall within the 515-foot contour line. Defendants followed this procedure then,

11 due primarily to the fault of Defendants' contractor, the structure was built incorrectly. The

12 permit procedure provides, as Defendants point out, that a failure to comply with permit

13 procedures could appropriately result in modification of the non-complying structure at the

14 property owner's expense. Equity would support such an outcome to the extent that it is

15 consistent with Tri-Dam's established permitting procedures. In the event that Defendants are

16 unable to submit a SMP compliant permit application the foregoing factors support a remedy in

17 equity requiring Defendants to completely remove the retaining wall and backfill the excavation

18 area to its pre-excavation condition.

19                                **V. ORDER**

20    Having concluded that a permanent injunction would be consistent with traditional

21 principles of equity, and having considered the four *eBay* factors to reach that determination, the

22 Court hereby finds that the following injunction is both equitable and reasonable to prevent or

23 restrain further violation of Plaintiff's easement.

24 IT IS HEREBY ORDERED that Tri-Dam's motion for summary judgment is GRANTED as

25 follows:

26    1.  Defendants are REQUIRED to submit to Tri-Dam and the Army Corps of Engineers

27        within 30 days a detailed plan regarding bringing their property into compliance by

28

destroying their retaining wall, including the footings, and filling the property to its pre-excavation condition.

2. Defendants MAY submit to Tri-Dam and the Army Corps of Engineers within 30 days a detailed plan regarding bringing their property into compliance by destroying their retaining wall down to the footings. This proposal must contain a plan for constructing a retaining wall that meets with Tri-Dam's requirements and makes use of the presently placed footings. Tri-Dam is encouraged but not required to consider granting a permit to Defendants as they have proposed.

3. In either case, Tri-Dam is to issue a decision to Defendants regarding the permit applications submitted in compliance with this order.

4. Within 60 days of the entry of Tri-Dam's decision on the permit application(s), or as soon thereafter as approved by the Army Corps of Engineers, Defendants MUST begin demolition of their retaining wall. Defendants are to complete their demolition and removal of the debris without unreasonable delay and in no event beyond the one-year timeframe provided by Section 4.4(2) of the SMP.

IT IS SO ORDERED.

Dated:   March 5, 2014            _____

                                 SENIOR  DISTRICT  JUDGE